Ron Kilgard, Bar No. 005902
Keller Rohrback L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:  (602) 248-0088
Facsimile:  (602) 248-2822
rkilgard@kellerrohrback.com
Counsel for Plaintiffs

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jerome M. Skrtich and Joseph F. Peck, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Pinnacle West Capital Corporation, the Benefit Administration Committee of the Pinnacle West Capital Corporation Retirement Plan and John/Jane Does 1-5,<br><br>Defendants. | Civil Action No.:<br><br><br><br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs, Jerome M. Skrtich and Joseph F. Peck, through their attorneys, on behalf

of themselves and all others similarly situated, allege:

## INTRODUCTION

1.     This is a class action against Pinnacle West Capital Corporation ("Pinnacle West"), the Benefit Administration Committee of the Pinnacle West Capital Corporation Retirement Plan (the "Committee") and the Committee's individual members concerning the failure to pay joint and survivor annuity ("JSA") benefits under the Pinnacle West Capital Corporation Retirement Plan (the "Plan") in amounts that satisfy the actuarial equivalence requirements in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA"). By failing to pay JSA benefits in amounts that are actuarially equivalent to the single life annuities offered to participants under the Plan, Defendants cause retirees to lose part of their vested retirement benefits in violation of ERISA.

2.     Pinnacle West sponsors the Plan. Under the Plan, participants earn retirement benefits in the form of a single life annuity, which the Plan calls a "straight life annuity" ("SLA"). An SLA provides participants with monthly payments for the rest of their lives when they retire. The Plan also offers participants three joint and survivor ("JSA") options. A JSA is an annuity for the participant's life with a contingent annuity payable to the participant's beneficiary (usually a spouse), which is expressed as a percentage of the amount paid during the participant's life. The Plan offers JSAs in percentages of 50, 75 and 100. Thus, a 50% JSA is a JSA that pays the spouse half of the amount that was paid to the participant before his or her death; a 75% JSA pays the spouse three quarters; and a 100% JSA pays the same amount. Both of the Plaintiffs are receiving 100% JSAs.

3.      The monthly benefit payable as a JSA, regardless of the percentage, will be less than the amount payable as an SLA because the JSA accounts for the likelihood that the Plan will have to pay benefits for a longer period if a participant dies before the spouse. However, ERISA limits the amount that JSA benefits can be reduced below the amount of a plan's SLA benefits. Under ERISA § 205(d), JSA benefits that pay between 50% and 100% of the amount paid during the joint lives of the participant and spouse must be at least the actuarial equivalent of the SLA. Two benefit options are actuarially equivalent when they have the same present value, calculated using the same, reasonable actuarial assumptions.

4.      Calculating present value requires inputting actuarial assumptions concerning projected mortality and interest rates. Mortality tables for the participant (and, in the case of a JSA, the participant's beneficiary) predict how long the participant and beneficiary will live to account for the likelihood of each future benefit payment being made. Over the last several decades, mortality rates have generally improved with advances in medicine and better collective lifestyle habits. People who retired recently are expected to live longer than those who retired in previous generations. Older mortality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables. As a result, using an older mortality table decreases the present value of a JSA and — interest rates being equal — the monthly payments retirees receive.

5.      The interest rate assumption accounts for the time value of money — the idea that a dollar in hand today is worth more than a dollar paid in a year, or in ten years — and discounts the value of expected future payments to the present. Like mortality, the interest

rate affects the calculation. Using lower interest rates — mortality rates being equal — decreases the present value of JSA benefits.

6.      To determine the amount of a benefit, mortality and interest rate assumptions, *together*, generate a "conversion factor," which is expressed as a percentage of the benefit being compared. The conversion factor can also be calculated by dividing the actual amounts payable under the plan. For example, if a JSA benefit pays $900 a month and the SLA pays $1,000 a month, the conversion factor would be .90. If the conversion factor between a JSA and an SLA is lower than the conversion factor that would be generated using reasonable mortality and interest rate assumptions, then the JSA will not be "actuarially equivalent" to the SLA. Accordingly, the conversion factor (and the actuarial assumptions used to generate it) determine whether two benefit forms are actuarially equivalent.

7.      Defendants calculate the conversion factor and, therefore, the present value of the JSAs offered to participants, using the 1971 Group Annuity Mortality Table for Males (the "1971 GAM"), a mortality table that is over 50 years old. By using mortality tables based on data from the 1960s, Defendants depress the present value of JSA benefits (relative to the SLA) resulting in monthly payments that are materially *lower* than they would be if Defendants used reasonable, up-to-date actuarial assumptions. In sum, Defendants are causing Plaintiffs and Class Members to receive less than they should as a pension benefit each month, which will continue to affect them throughout their retirements.

8. Defendants' conduct is particularly egregious because Pinnacle West uses current, updated actuarial assumptions to calculate and report its Plan liabilities in its audited financial statements and then justifies increasing its customers' utility rates because of these increased liabilities. For example, Pinnacle West's pension liabilities increased by $67 million when it updated the mortality assumption in 2014 to the most-recent applicable table and then cited this increase as a reason for increasing the utility rates it charges customers. In other words, Pinnacle West uses current, realistic mortality assumptions when reporting its pension costs to justify increasing the utility rates it charges customers, but uses mortality rates from the 1960s when calculating retirees' Plan benefits.

9. Plaintiffs seek an order from the Court (1) declaring that the actuarial assumptions used to calculate JSA benefits under the Plan produce benefits that are less than the actuarial equivalent of the SLA offered to participants; (2) requiring Defendants to pay all amounts improperly withheld in the past and to be withheld in the future; (3) requiring Defendants to recalculate Plaintiffs' JSA benefits in a manner consistent with ERISA's actuarial equivalence requirements; (4) requiring Defendants to increase the amounts of Plaintiffs' future benefit payments; and (5) such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

11.    This Court has personal jurisdiction over Defendants because they transact business in, or reside in, and have significant contacts with this District, and because ERISA provides for nationwide service of process. Defendant Pinnacle West is headquartered in this District, and, upon information and belief, the Committee and its members are also based in this District.

12.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Pinnacle West does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiffs

13.    Plaintiff Jerome Skrtich is a Plan participant who worked for Pinnacle West. Mr. Skrtich began receiving his Plan benefits as a 100% JSA, with his spouse as the beneficiary, in 2021.

14.    Plaintiff Joseph F. Peck is a Plan participant who worked for Pinnacle West. Mr. Peck began receiving his Plan benefits as a 100% JSA, with his spouse as the beneficiary, in 2018.

### Defendants

15.    Pinnacle West is a holding company that is headquartered and has its principal place of business in Phoenix, Arizona. Its primary subsidiary is Arizona Public

Service Company ("APS"), Arizona's largest electric utility. Pinnacle West sponsors the Plan and has the right to amend or terminate it.

16.     Upon information and belief, the Committee is an unincorporated association based in Phoenix, Arizona. The Committee is the named fiduciary and the Plan Administrator of the Plan within the meaning of ERISA §§ 402(a)(2) and 3(16)(A), 29 U.S.C. §§1102(a)(2) and 1002(16)(A).

17.     John/Jane Does 1-5 are the individual members of the Committee responsible for administrating the Plan during the Class Period. Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### *Pension Benefit Options Must Be Actuarially Equivalent*

18.     ERISA requires that defined benefit plans pay married participants and their beneficiaries in the form of a qualified JSA (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment. This makes the QJSA the default benefit for employees who are married. *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

19.     ERISA defines a QJSA as an annuity for the life of the participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse. ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1). A QJSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(1). *Id.* Accordingly, a plan can offer

multiple QJSA options; that is, JSAs that pay survivor benefits between 50% to 100%. *Id.* A QJSA must be actuarially equivalent to an SLA. *Id.*

20.     Pension plans must also offer participants at least one other form of survivor annuity, known as a qualified optional survivor annuity ("QOSA"). *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2). A QOSA is similar to a QJSA, except that the QOSA's survivor annuity percentage must be: (a) greater than 75% if the QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the QJSA's survivor annuity percentage is greater than 75%. The definition of a QOSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(2). ERISA requires that QOSAs be actuarially equivalent to an SLA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

21.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA"). ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity for the life of the vested participant's surviving spouse (*i.e.*, a beneficiary) if the participant dies before reaching the plan's normal retirement age. ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be actuarially equivalent to the benefit the surviving spouse would have received under the plan's QJSA. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

22.     Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205, which concerns alternative forms of benefits. *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

23.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)) provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." Indeed, a QJSA "must be as least as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16; *see also* 26 C.F.R. § 1.401(a)-11(b)(2) (A QJSA "must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."). Accordingly, if a plan offers benefit options that are more valuable than the SLA, the QJSA must be at least as valuable as the most valuable form of benefit. The regulations regarding QJSAs apply "when the participant attains the earliest retirement age under the plan." 26 C.F.R. § 1.401(a)-20 Q&A 17.

24.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement. *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if they do, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the present value of the lump sum be at least equal to the present value of the participant's benefits determined using the applicable mortality table (the "Treasury Mortality Table")[1] and applicable interest rates (the "Treasury Interest Rate")[2] (collectively, the "Treasury Assumptions"). The Treasury Assumptions are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market rates

---

[1]     *See* 26 C.F.R. § 1.430(h)(2)-1.
[2]     *See* 26 C.F.R. § 1.430(h)(3)-1.

and mortality assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

25.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.

26.     The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

### *Reasonable Factors Must Be Used When Calculating Actuarial Equivalence*

27.     "Two modes of payment are actuarially equivalent when ***their present values are equal*** under a given set of assumptions."  *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[3]

28.     Under ERISA, "present value" must "reflect anticipated events."  Present value adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe."  ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

---

[3]     According to Merriam Webster: "Equivalent" means "equal."  *See* https://www.merriam-webster.com/dictionary/equivalent. "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal.

(a)      The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b)      A plan must determine optional benefits using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)      The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

(d)      With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

29.    The Regulations also rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

30.    Like the Regulations and ERISA's definition of " present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board

("ASB")[4] of the American Academy of Actuaries (the "Academy") require actuaries to use "reasonable assumptions." *See* ASOP No. 27, § 3.6 ("each economic assumption used by an actuary should be reasonable"); *see also* ASOP No. 35, § 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

31.    Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018). As the Ninth Circuit stated in *McDaniel v. Chevron Corp.* 203 F.3d 1099, 1110 (9th Cir. 2000):

> The most important consideration in preparing and selecting a mortality table to be used in calculating pension benefits is whether the population from whom the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants.

32.    The court explained in *Dooley v. Am. Airlines, Inc.* that each assumption used in an actuarial equivalence determination must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity. The term actuarially equivalent means equal in value to the present value of normal retirement benefits,

---

[4]    The ASB, an independent entity created by the Academy in 1988, serves as the single board promulgating standards of practice for the entire actuarial profession in the United States. The ASB was given sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the actuarial profession.

> *determined on the basis of actuarial assumptions with respect to*
> *mortality and interest which are reasonable in the aggregate*.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at * 10 (N.D. Ill. Nov. 4, 1993) (emphasis

added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing

expert testimony that "actuarial equivalence must be determined on the basis of reasonable

actuarial assumptions.").

33.    Actuarial equivalence should be "cost-neutral," meaning that neither the plan

nor participants should be better or worse off if participants select an SLA or a JSA. *See*

*Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1118–19 (M.D. Fla. 2005). "Periodically,

the assumptions used [for actuarial equivalence] must be reviewed and modified so as to

insure that they continue to fairly assess the cost of the optional basis of payment."

Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-CV-0505,

2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial

assumptions that a reasonable actuary would use at the time of the benefit determination.").

## SUBSTANTIVE ALLEGATIONS

### I.    The Plan

34.    The Plan covers substantially all employees of Pinnacle West, including

those employed by APS.

35.    The Plan is an "employee pension benefit plan" within the meaning of

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning

of ERISA § 3(35), 29 U.S.C. § 1002(35). It provides participants with retirement benefits.

36.     The Plan has two primary parts. Under the "Traditional" part, participants earn a pension benefit in the form of an SLA based on their average monthly pay and years of service at retirement.

37.     The Plan also has a "Retirement Account Balance" part, under which participants accrue benefits under a cash balance formula. All participants hired after 2002 accrue benefits under the Retirement Account Balance part under which Pinnacle West contributes a percentage of the participant's compensation to a hypothetical account that accumulates interest. Plan participants employed by Pinnacle West as of December 31, 2002 could also choose whether to continue earning benefits under the Traditional part or begin earning benefits under the Retirement Account Balance part (with their pre-2003 benefit determined under the frozen Traditional Part).

38.     Under both parts of the Plan, participants may select an SLA and JSAs with survivor percentages of 50%, 75% and 100%. While each of the Plan's JSA options qualify as QJSAs under ERISA § 205(d), the 50% JSA is the Plan's designated QJSA, and the default form of benefit for married participants. Pinnacle West has designated the Plan's 75% JSA and 100% JSA as QOSAs.

39.     To determine the amount of the 50%, 75% and 100% JSAs, the Plan uses a 7.50% interest rate and the 1971 GAM (weighted 95.7% male/4.3% female for participants and 4.3% male and 95.7% female for beneficiaries).

II.    **The Plan's JSAs Do Not Satisfy ERISA's Actuarial Equivalence Requirements**

A.    **Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable as of the Date Benefits Are Calculated**

40.    As discussed above, to compare the present values of two benefit options offered to a plan participant at the time she begins collecting benefits, it is necessary to determine the present value of the ***aggregate*** (*i.e.,* total) future benefits that the participant (and, if applicable, the beneficiary) is expected to receive under each form using actuarial assumptions that are reasonable as of that date. There are two main components of these present value calculations: (1) an interest rate; and (2) the mortality table applied to participants and beneficiaries.

41.    An interest rate is used to determine the present value of each future payment. This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns. The rate is often called a "discount rate" because it discounts the value of a future payment. *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003). ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent.").

42.    The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27). The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See,*

*e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

43.    As alleged above, under § 3.6 of ASOP No. 27,[5] "each economic assumption used by an actuary should be reasonable."[6] An assumption is deemed "reasonable" if it "takes into account historical and current economic data that is relevant as of the **measurement date**," and "reflects the actuary's estimate of future experience." *See* ASOP No. 27, § 3.6 (emphasis in original). The Treasury Interest Rates are reasonable because they are updated to reflect current economic conditions.

44.    A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

45.    More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The SOA, an independent actuarial group, publishes the mortality tables that are the most widely used by defined benefit plans when doing these calculations. The SOA published mortality tables in 1971 (the "1971 GAM"),[7] 1976 (the "UP 1984"), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014"), and 2019 (the "Pri-2012") to account for changes to the population's mortality experience.

---

[5]    Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield); *see also McDaniel*, 203 F.3d at 1110 (citing American Academy of Actuaries' publication).

[6]    Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/

[7]    The table's full name is the "1971 Group Annuity Mortality Table." It is commonly referred to as the "1971 GAM" but is sometimes described as the "1971 GAT" or the "1971 GA Table."

46.    Since at least the 1980s, the life expectancies in mortality tables have been on an upward trend as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.[8] According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would substantially increase projected morality and, therefore, increase pension liabilities by 7%.

47.    Under § 3.5.3 of ASOP 35, mortality tables must be adjusted on an ongoing basis to reflect improvements in mortality.[9]

48.    Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in

---

[8]    Life expectancies with a projection scale assume a generational projection of future mortality improvements (i.e., life expectancies increase with year of birth).

[9]    *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement.

mortality. For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality since publication of the table. IRS Notice 2016-50.[10]  In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[11]

49.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C § 1002(27). The Treasury Mortality Tables are updated to reflect recent mortality data from participants in private pension plans. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv). Accordingly, the Treasury Assumptions are reasonable.

50.     Using a reasonable interest rate and mortality table, the present values of the SLA and the other forms of benefit can be compared to determine whether those forms of benefit are actuarially equivalent. Pension plans must use reasonable interest rates and mortality tables to evaluate whether the present values of benefit options produce actuarially equivalent benefits for participants and beneficiaries.

---

[10]     *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.
[11]     *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

**B.** **Pinnacle West Uses Actuarial Assumptions to Calculate Plan Liabilities That Are Significantly Different Than Those Used to Calculate JSAs**

**1.** **Pinnacle West Uses Updated Actuarial Assumptions to Calculate Its Financial Obligations to Pay Benefits.**

51.    For purposes of its filings with the U.S. Securities and Exchange Commission ("SEC"), Pinnacle West uses reasonable, current mortality assumptions to calculate the present value of its benefit obligations under the Plan. Specifically, Pinnacle West's audited financial statements are prepared in accordance with the Generally Accepted Accounting Principles ("GAAP"), pursuant to which, mortality assumptions must reflect the "best estimate" for that assumption as of the current measurement date. This principle regarding the mortality assumptions used by defined benefit plans was stated in a publication by Deloitte & Touche LLP ("Deloitte"), Pinnacle West's auditor:[12]

> This publication highlights some of the important accounting considerations related to the calculations and disclosures entities provide under U.S. GAAP in connection with their defined benefit pension and other postretirement benefit plans.
>
> ***
>
> **Mortality Assumption**
>
> …Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC[13] 715-30 and ASC 715-60, *each assumption should represent the "best estimate" for that assumption as of the current measurement date*. Entities should consider whether the mortality tables used and adjustments made

---

[12]    Among other things, Deloitte prepares the annual Report of Independent Registered Public Accounting Firm for purposes of Pinnacle West's filings with the SEC.

[13]    "ASC" is an acronym for Accounting Standards Codification.

(*e.g.*, for longevity improvements) are appropriate for the employee base covered under the plan. (Emphasis added.) …[14]

52.    During all relevant times, Pinnacle West used what was at the time a current, reasonable mortality table to calculate its pension liabilities. To measure its liabilities for the year ending December 31, 2013, Pinnacle West used the RP-2000 mortality table, projected with an improvement scale. Pinnacle West represented in its annual report on Form 10-k for the fiscal year ending December 31, 2014 (the "2014 Form 10-k"), that it employed the most recently published mortality tables at that time, the RP-2014, and an updated improvement scale, to calculate its pension and other postretirement obligations, recognizing the well-documented improvements to mortality. In particular, Pinnacle West's 2014 Form 10-k provides:

> In October 2014, the Society of Actuaries' Retirement Plans Experience Committee issued its final reports on its recommended mortality basis ("RP-2014 Mortality Tables Report" and "Mortality Improvement Scale MP-2014 Report"). At December 31, 2014, we updated our mortality assumptions using the recommended basis with modifications to better reflect our plan experience and additional data regarding mortality trends. The updated mortality assumptions resulted in a $67 million increase in Pinnacle West's pension and other postretirement obligations. . . .[15]

53.    Pinnacle West reviews the mortality assumption used to calculate its pension liabilities reported in its Form 10-k "on an annual basis and adjust them as necessary."[16] Since 2014, Pinnacle West has continued use of the RP-2014 mortality assumption to

---

[14]    Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 19-2, November 1, 2019 at 1, 4–5.

[15]    *See* Pinnacle West's Form 10-k for year ending December 31, 2014 at 108–09.

[16]    *See* Pinnacle West's Form 10-k for year ending December 31, 2014 at 81.

calculate its pension liabilities, determining each year that the rates used in that table were consistent with the Plan's mortality experience.

54.     Pinnacle West updates the mortality assumptions used in its financial statements to report to its shareholders the projected benefits costs associated with the Plan based on the SOA's current publications. In sharp contrast, for participants that select JSAs, Pinnacle West continues to use the 1971 GAM, an outdated and otherwise flawed mortality assumption, to determine participants' actual benefit amount.

55.     Pinnacle West's methodology to determine the discount rate used to determine the actuarial present value of Plan benefits that it reports in its financial statements is also consistent with ASOP 27 and reflects current economic conditions. Like the mortality assumption that it uses, Pinnacle West reviews the discount rates it uses to calculate its pension liabilities "on an annual basis and adjust[s] them as necessary."[17]  The discount rates that Pinnacle West used to calculate the actuarial present value of the Plan's liabilities since 2012 are shown below.

| Year | Discount Rate |
|------|---------------|
| 2012 | 4.01% |
| 2013 | 3.88% |
| 2014 | 4.02% |
| 2015 | 4.37% |
| 2016 | 4.08% |
| 2017 | 3.65% |
| 2018 | 4.34% |
| 2019 | 3.30% |
| 2020 | 2.53% |

---

[17]     *See* Pinnacle West's Form 10-k for year ending December 31, 2017 at 74.

| 2021 | 2.92% |

**2.    The Plan Uses Unreasonable Assumptions to Calculate JSAs, Reducing Participants' Benefits in Violation of ERISA.**

56.    Throughout the relevant period, Pinnacle West used a 7.50% interest rate and the 1971 GAM table to calculate JSAs and make actuarial equivalence determinations. In making its mortality assumption under the 1971 GAM table, Pinnacle assumed that 95.7% of participants were male, and only 4.3% were female, and it assumed that gender blend for beneficiaries was the reverse.

57.    Defendants' use of these actuarial assumptions was unreasonable because the mortality tables are outdated and do not "reflect anticipated events" (*i.e.*, the anticipated mortality rates of participants).

58.    The 1971 GAM was published in 1971 using mortality data from the 1960s for participants in group annuity plans. Mortality rates have significantly declined since the 1960s, resulting in a greater overall life expectancy for retiring participants in pension plans. Accordingly, the 1971 GAM that the Plan uses was ***not*** developed from a population that "has characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110.

59.    By way of example, under the 1971 GAM, a 65-year-old male is expected to live another 15.2 years (until age 80.2). Under the RP-2014, however, a 65-year-old male is expected to live another 21.6 years (until age 86.6), a ***42 percent increase***. Females likewise have longer life expectancies under the RP-2014 than the 1971 GAM. Accordingly, the average retiring employee would be expected to receive, and the average

employer would be expected to pay, benefits for a substantially longer period than projected in the 1971 GAM table.

60.    Defendants exacerbated the differences between mortality rates in the 1971 GAM table and contemporary mortality rates by using a table for participants that was only 4.3% female, when in fact, Pinnacle West's workforce is approximately 25% female.[18] Overweighting the gender blend in the 1971 GAM towards males did not account for males' greater improvements in mortality years relative to females over the past 40 as reflected in current mortality tables. Using a gender blend that assumes only 4.3% of the population is female does not have "characteristics that are typical of the plan's participants," *McDaniel*, 203 F.3d at 1110. Moreover, it further reduced participants' JSAs.

61.    Defendants failed to provide JSAs that were actuarially equivalent to the SLA that participants were entitled to receive when they retired as required by ERISA § 205(d), 29 U.S.C. § 1055(d). By using outdated or otherwise flawed mortality assumptions, Defendants have materially reduced the monthly benefits that participants and beneficiaries under the Plan receive in comparison to the monthly benefits they would receive if Defendants applied updated, reasonable mortality assumptions.

### 3.    Defendants Used Unreasonable Assumptions as a Basis For Overcharging Customers.

62.    Defendants knew that the 1971 GAM table was unreasonable, and that it produced lower monthly benefits for participants and beneficiaries receiving JSAs.

---

[18]    *See, e.g.* https://www.pinnaclewest.com/corporate-responsibility/ social/employees/default.aspx

63.     As alleged above, and as Pinnacle West acknowledged in its Form 10-k for the year ending December 31, 2014, changing from the RP-2000 to the RP-2014 mortality table increased Pinnacle West's pension and post-retirement liabilities by $67 million, which would require Pinnacle West to contribute greater amounts to the Plan. But as Pinnacle West represented in its Form 10-k, it passed the impact of these increased Plan liabilities to its customers. Pinnacle West's Form 10-k states:

> A significant portion of the changes in the actuarial gains and losses of our pension and postretirement plans is attributable to APS and are recoverable in rates. Accordingly, these changes are recorded as a regulatory asset or regulatory liability.[19]

64.     In 2016, Pinnacle West filed an application with the Arizona Corporation Commission seeking to increase customers' utility rates annually by $165.9 million, or 5.74% for the average customer. Pinnacle West requested, and ultimately received, a rate increase, in part, because its employee benefit costs increased when calculated by its actuary using the reasonable updated mortality table Pinnacle West determined was its "best estimate" of Plan participants' mortality in 2014. Simply put, since retirees were living longer, it cost Pinnacle West more to operate the Plan, and Pinnacle West passed those costs on to its customers. Still, however, Pinnacle West continued to use the 1971 GAM to calculate actual benefits for retirees like Plaintiffs and the other members of the Class.

65.     Because these two analyses — determining Plan liabilities to justify a rate increase and determining plan benefits actually paid to participants — measure the length

---

[19]     *See* Pinnacle West's Form 10-k for year ending December 31, 2018 at 133.

of the same lives and the same benefit streams, they should use the same mortality assumptions. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit . . . 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. PriceWaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

66.     Had the Plan used reasonable actuarial assumptions, such as those Pinnacle West used to justify a rate increase or the Treasury Assumptions, Plaintiffs and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

67.     Plaintiff Jerome Skrtich started receiving benefits at age 60. He selected a 100% JSA, which pays $3,281.30 a month. However, if reasonable, current assumptions had been applied when Mr. Skrtich retired, his benefit would be higher. Using, for example, the Treasury Assumptions that were current when he retired (with a gender blend for the mortality table that reflects the Plan's demographics), Mr. Skrtich's benefit would be $3,344.21 per month. By using unreasonable actuarial assumptions, Defendants reduced the present value of Mr. Skrtich's pension benefits by more than $17,000.

68.     Plaintiff Joseph Peck started receiving benefits at age 63. He selected a 100% JSA, which pays $3,369.60 a month. Using the Treasury Assumptions that were current when he retired (with a gender blend for the mortality table that reflects the Plan's demographics), Mr. Peck's benefit would be $3,560.99 a month. By using unreasonable

actuarial assumptions, Defendants reduced the present value of Mr. Peck's pension benefits by more than $47,000.

69.     Plaintiffs are participants in the Plan who are receiving benefits calculated using the 1971 GAM and the 7.5% discount rate. Because their benefits were calculated using an outdated, unreasonable mortality table, each of the Plaintiffs has been harmed. They are receiving less each month than they would have received if reasonable, up-to-date actuarial assumptions had been used. Plaintiffs, along with other class members, have been substantially damaged as a result of receiving benefits below an actuarially equivalent amount in violation of ERISA.

## CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the class (the "Class") defined as follows:

> All participants in and beneficiaries of the Plan who began receiving a JSA or QPSA after November 1, 2016. Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plan.

71.     The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes thousands of persons. According to the Plan's most recent Form 5500, there are 6,931 retired participants receiving benefits.

72.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims and the claims of all Class members arise out of the same policies

and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

73.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      A.     Whether the Plan's existing formulae provide JSA and QPSA benefits that are actuarially equivalent to the SLA participants could have selected;

      B.     Whether the Plan's actuarial assumptions are reasonable;

      C.     Whether Plaintiffs and Class members should have their benefits recalculated to conform with ERISA's actuarial equivalence requirements; and

      D.     Whether Plaintiffs and Class members should receive payments to compensate them for past and future benefit payments that did not and will not satisfy ERISA's actuarial equivalence requirements.

74.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions. Plaintiffs have no interests antagonistic to those of other members of the Class. They are each committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

75.     This action may be properly certified under either subsection of Federal Rule of Civil Procedure 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A)

because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

76.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

77.    If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under Rule 23(b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

78.    Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

79.    Defendants have improperly reduced JSAs for participants and beneficiaries of the Plan below the amounts that they would receive if those benefits were actuarially

equivalent to an SLA in violation of ERISA §§ 205(d)(1) and 203(a), 29 U.S.C. § 1055(d)(1) and 29 U.S.C. § 1053(a).

80.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

81.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the methodologies used by Defendants for calculating the actuarial equivalence of JSAs and QPSAs violate ERISA because they do not provide an actuarially equivalent benefit, as required by ERISA § 205(d), 29 U.S.C. § 1055(d), and deprived Plaintiffs of their vested benefits in violation of ERISA § 203(a), 29 U.S.C. 29 U.S.C. § 1053(a).

82.    Plaintiffs further seek an order from the Court providing a full range of equitable relief, including but not limited to:

    (a)    re-calculation, correction, and payment of JSA and QPSA benefits previously paid under the Plan;

        (b)    an "accounting" of all prior benefits and payments;

        (c)    an equitable surcharge;

        (d)    disgorgement of amounts wrongfully withheld;

        (e)    disgorgement of profits earned on amounts wrongfully withheld;

        (f)    a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))**

83.     Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

84.     The Committee is a named fiduciary of the Plan.

85.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent that person "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. As such, neither "named fiduciary" status, nor formal delegation is required for a finding of fiduciary status, and contractual agreements, such as the governing Plan documents, cannot override a finding of fiduciary status when the statutory test is met.

86.     The Committee and its members are fiduciaries for the Plan because throughout the Class Period they have been named fiduciaries of the Plan, and/or exercised

discretionary authority or control respecting the management of the Plan, and/or exercised authority or control over the management or disposition of the Plan's assets, and/or have had discretionary authority or discretionary responsibility in the administration of the Plan. Among other things, during the Class Period, the Committee has had authority or control over the determination of the amount and payment of benefits from the Plan.

87.    Pinnacle West is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control with respect to the management of the Plan, and/or exercised authority or control over management or disposition of the Plan's assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan, including, but not limited to, its duty to appoint and monitor members of the Committee.

88.    ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) requires Defendant-fiduciaries to discharge their duties with respect to the Plan "in accordance with the documents and instruments governing the plan[s] insofar as such documents and plan instruments are consistent with" ERISA.

89.    The Plan's terms are not consistent with ERISA because the Plan uses unreasonable actuarial assumptions to calculate JSAs and QPSAs that do not provide actuarially equivalent benefits. As a result, participants and beneficiaries do not receive actuarially equivalent benefits, like ERISA requires, and lose vested benefits in violation of ERISA.

90.    Here, Defendants breached their fiduciary duties by following the Plan terms which violate ERISA because those terms result in participants receiving less than the actuarial equivalent of their vested accrued benefits.

91.    ERISA further imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the Committee to pay benefits that were not actuarially equivalent, in violation of ERISA, Defendant Pinnacle West breached its fiduciary duty to supervise and monitor the Committee.

92.    As a direct and proximate result of the Defendants' fiduciary breaches, participants in the Plan have lost, and are continuing to lose, millions of dollars in vested accrued pension benefits.

93.    Pinnacle West and the Committee are jointly liable for the acts of the other as co-fiduciaries for the Plan.

94.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

95.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plan's established methodologies for calculating JSAs and QPSAs do not provide actuarially equivalent benefits because they do not provide benefits with an equal present value.

96.     Plaintiffs further seek orders from the Court providing a full range of equitable relief including but not limited to:

(a)     re-calculation, correction, and payment of actuarially equivalent JSA and QPSA benefits previously paid under the Plan;

(b)     an "accounting" of all prior benefits and payments;

(c)     an equitable surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Declare that the Plan has failed, and continues to fail, to properly calculate and pay JSA and QPSA benefits that are actuarially equivalent to the SLA, in violation of ERISA;

C.     Order Defendants to correct and recalculate JSA and QPSA benefits that have been paid under the Plan;

D.      Order Defendants to provide an "accounting" of all prior payments of JSA and QPSA benefits under the Plan to determine the proper amounts that should have been paid;

E.      Order Defendants to pay all benefits improperly withheld, including under the theories of equitable surcharge and disgorgement;

F.      Order Defendants to disgorge any profits earned on amounts improperly withheld;

G.      Impose a constructive trust;

H.      Impose an equitable lien;

I.      Order Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

J.      Award, declare, or otherwise provide Plaintiff and the Class with all relief available under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

K.      Award to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

L.      Any other relief or remedy the Court determines is just and proper.

Dated: October 13, 2022.                    Respectfully submitted,


 /s/ *Ron Kilgard*
**KELLER ROHRBACK L.L.P.**
Ron Kilgard
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
rkilgard@kellerrohrback.com


**IZARD, KINDALL & RAABE LLP**
Robert A. Izard (*pro hac vice* application
forthcoming)
Douglas P. Needham (*pro hac vice*
application forthcoming)
Oren Faircloth (*pro hac vice* application
forthcoming)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
rizard@ikrlaw.com
dneedham@ikrlaw.com
ofaircloth@ikrlaw.com


***Counsel for Plaintiffs***