Joseph G. Adams (#018210)
Zachary G. Schroeder (#036226)
SNELL & WILMER L.L.P.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: jgadams@swlaw.com
       zschroeder@swlaw.com

Christian J. Pistilli (admitted *pro hac vice*)
Robert Newman (admitted *pro hac vice*)
Nicholas Pastan (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202-662-6000
E-Mail: cpistilli@cov.com
       rnewman@cov.com
       npastan@cov.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jerome M. Skrtich, Joseph F. Peck, and Michael Riccitelli on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>   v.<br><br>Pinnacle West Capital Corporation; the Benefit Administration Committee of the Pinnacle West Capital Corporation Retirement Plan, and; John/Jane Does 1-5,<br><br>               Defendants. | Civil Action No. 22-cv-01753-SMB<br><br>**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**(Oral Argument Requested)** |

1

**INTRODUCTION**

Plaintiffs are participants receiving various types of joint and survivor annuity ("JSA") pension benefits under the Pinnacle West Capital Corporation Retirement Plan (the "Plan"). Though it is undisputed that Plaintiffs are receiving all benefits promised by the Plan, Plaintiffs allege that if the Plan calculated their JSAs using a specific application of actuarial assumptions (a mortality table and interest rate) found in an inapplicable provision of the Internal Revenue Code, 26 I.R.C. § 417(e)(3) ("IRC 417(e)"), they would receive slightly higher monthly payments. Plaintiffs now move to certify their claims on behalf of a manufactured proposed class defined by Plaintiffs' desired outcome in this case. However, this contrived class definition cannot save Plaintiffs from the problems that have doomed class certification efforts in several nearly identical cases.

*First*, Plaintiffs' proposed class is not ascertainable. Though Plaintiffs' class definition may appear highly (and unusually) specific, it does not specify whether the IRC 417(e) assumptions should be applied to each participant's single life annuity ("SLA") at benefit commencement date or normal retirement age. This is a disputed legal issue in the case. And the answer has enormous consequences. If, for example, the Court adopts Plaintiffs' preferred assumptions but agrees with Defendants that they apply to the SLA at normal retirement age, no named Plaintiff would have suffered harm, and therefore none would be a class member. This alone defeats class certification.

*Second*, the proposed class fails Rule 23(a)'s commonality requirement. In an effort to avoid the commonality problems that prevented class certification in two prior cases involving nearly identical class claims, Plaintiffs propose a class based on their expert's contested and highly doubtful views on several disputed merits issues. Doing so only highlights that these cases are not fit for class treatment. Except in the extremely unlikely event that Plaintiffs run the table on all of these issues, the proposed class includes JSA recipients who were not harmed and arbitrarily excludes some who Plaintiffs' expert concludes were harmed. Moreover, Plaintiffs' class definition presupposes that the Court will reject the well-founded principle that actuarial equivalence is "a zone, not a point."

Were the Court to determine that Plaintiffs' arbitrary measure of actuarial equivalence is not compulsory, the composition of who is harmed would change significantly because different combinations of actuarial assumptions affect plan participants differently. Finally, numerous intra-class conflicts preclude a finding of commonality. Many class members would be disadvantaged by the relief that Plaintiffs seek and would fare better by the selection of a slightly different mortality table or interest rate assumption than the one specified in the class definition.

*Third*, there is no typicality because the three named Plaintiffs receive distinct types of benefits subject to unique defenses. Plaintiffs assert claims under 29 U.S.C. §1055(d), which protects two specific benefits forms—a plan's Qualified Joint and Survivor Annuity ("QJSA") and Qualified Optional Survivor Annuity ("QOSA"). But none of the named Plaintiffs elected to receive a QJSA or QOSA. They are therefore subject to the unique defense that their benefits are not subject to ERISA's "actuarial equivalence requirement." Similar fundamental questions about how to interpret 29 U.S.C. §1055(d) also derailed class certification in *Berube v. Rockwell Automation, Inc.* Additionally, all named Plaintiffs elected to receive early retirement benefits, which were heavily subsidized by the Plan. As a result, they are all receiving benefits in amounts that are substantially greater than the value of their accrued benefits using Plaintiffs' preferred assumptions. All named Plaintiffs are thus subject to the unique defense that they were not harmed, even if Plaintiffs' preferred actuarial assumptions apply. Hundreds of Plan participants who elected to receive their JSAs at normal retirement age or later are not subject to this defect and risk dismissal of their claims on this unique issue.

*Finally*, class certification is improper under Rule 23(b). Certification fails under Rule 23(b)(1) and 23(b)(2) because Plaintiffs seek relief that will harm certain participants when applied across the proposed class. Certification should be denied under 23(b)(3) because conflicts among proposed class members prevent predominance.

3

# BACKGROUND

## I. The Plan and Its Actuarial Assumptions.

Plaintiffs all receive benefits under the Plan. Decl. of Nicholas Pastan, Ex A at 1 (Peck); *id.*, Ex. B at 1 (Riccitelli); *id.*, Ex. C (Skrtich).[1] The Plan offers various forms of benefits payments. The Plan's normal form of benefit for unmarried participants is an SLA, commencing at age 65, though Plan participants can receive benefits before age 65 if they meet certain requirements. Dkt. 63.1 at 48. An SLA provides monthly payments to participants from retirement until their death. *Id.* Participants may also elect JSAs: (1) a 50% JSA, (2) a 75% JSA, or (3) a 100% JSA. *Id.* at 48, 50-51. A JSA provides monthly payments to a participant from retirement until death and, if the joint annuitant survives the participant, the specified percentage of such monthly payment amount is then paid to the joint annuitant until death. *Id.* The Plan's default JSA for married participants is the 50% JSA, *id.* at 48, which is also the Plan's QJSA. That makes the Plan's QOSA the 75% JSA. *Id.*; 29 U.S.C. § 1055(d)(2)(B).

The Plan converts the SLA to a JSA using actuarial assumptions consisting of a mortality table and interest rate. Dkt. 63.1 at 2. The Plan's actuarial assumptions are (1) a 7.50% interest rate, and (2) the 1971 Group Annuity Mortality Table. *Id.*

## II. Plaintiffs' ERISA Claim.

Plaintiffs claim that the Plan's actuarial assumptions violate 29 U.S.C. § 1055(d) because they fail to generate conversion factors that produce JSAs that are "actuarially equivalent to the SLA[s] that participants were entitled to receive when they retired." Dkt. 17 ¶ 61. Specifically, Plaintiffs allege that the Plan's assumptions fail because the mortality assumption is "outdated" and overweighted towards males. *Id.* ¶¶ 56–61. Plaintiffs contend that "if Defendants used reasonable, up-to-date actuarial assumptions" participants receiving JSAs would receive higher monthly payments. *Id.* ¶ 7. However, even Plaintiffs'

---

[1] All exhibit designations herein refer to the exhibits attached to the Declaration of Nicholas Pastan submitted in support of Defendants' Opposition to Plaintiffs' Motion.

4

own expert, Ian Altman, concedes that the relevant inquiry is the conversion factor produced by the combination of the mortality and interest rate assumptions, not whether the mortality table or interest rate alone is outdated. Ex. D, Altman Dep. Tr. at 24:3-7.

Though Plaintiffs' FAC challenges all the Plan's JSAs, the provision of ERISA they sue under protects only two distinct forms of benefits—a QJSA and a QOSA. *See* 29 U.S.C. §§ 1055(d)(1)(B) (requiring a QJSA to be "actuarially equivalent"), 1055(d)(2)(A)(ii) (requiring a QOSA to be "actuarially equivalent"). Crucially, not all JSAs qualify as a QJSA or QOSA. A plan defines which JSA is its QJSA. *See* 26 C.F.R. § 1.401(a)-20, Q&A-16 ( "the plan must designate which [annuity] is the QJSA"). ERISA defines the plan's QOSA based on its QJSA. *See* 29 U.S.C. § 1055(d).

### III. Plaintiffs Receive Unique Benefits that Are Not a QJSA or QOSA.

Plaintiffs each receive distinct forms of benefits, none of which is the Plan's QJSA or QOSA. *See* Ex. E, Terry Report at Fig. 6 (showing that no named Plaintiff receives a "qualified" annuity under the Plan). Mr. Skrtich receives a combination 100% JSA and lump sum benefit. Ex. C. Mr. Peck receives a 100% JSA. Ex. A. And, Mr. Riccitelli receives a combination 50% JSA and lump sum benefit. Ex. B.

When Mr. Skrtich and Mr. Riccitelli elected their benefits, they were informed that their benefit forms were not a QJSA. Ex. F (Skrtich) ("If you elect a form of payment other than a Qualified Joint and Survivor Annuity or other Qualified Optional Survivor Annuity, you must provide a notarized spousal consent form."); Ex. J at 26:9-11; *see also* Ex. G (Riccitelli); Ex. I at 61:4-17. Their spouses were also informed of this fact and were required to sign and notarize consent forms attesting that they understood they had the right to receive a QJSA and that they "agree[d] to give up that right." Ex. F; *see also* Ex. G.

Each named Plaintiff also receives an early retirement benefit because each elected to receive his JSA before reaching the Plan's normal retirement age of 65. Ex. H, Peck Dep. Tr. at 14:13-16; Ex. I, Riccitelli Dep. Tr. at 17:9-11; Ex. J, Skrtich Dep. Tr. at 10:21-22. By doing so, each Plaintiff benefitted from the Plan's early retirement subsidies, which allowed them to receive JSAs that are greater than the value of the SLAs they would have

received at normal retirement age. Ex. E ¶ 248.

### IV. Plaintiffs' Narrow, Arbitrary Approach to Actuarial Equivalence.

In their Motion, Plaintiffs seek to predicate their claims on an extremely narrow theory of actuarial equivalence. *See* Dkt. 62 at 3. Plaintiffs do not simply contend that 29 U.S.C. §1055(d) requires the use of actuarial assumptions that reflect contemporary mortality and interest rates, as they did in the FAC. Instead, Plaintiffs now claim that "actuarial equivalence" can only be achieved if the pension benefit a participant receives under the Plan is equal to the benefit that results from their expert's idiosyncratic application of the mortality table and interest rates prescribed by IRC 417(e). *Id.*; Dkt. 63.2 at 18; Ex. D at 83:4-12 ("I picked … one basis for making my determination, and anything less than that is, by definition of the way I made the calculation, unreasonable.").

Mr. Altman's theory of liability is not required by actuarial practice or law, which he admits. *Id.* at 228:19-229:4. IRC 417(e) contains interest rate and mortality assumptions imposed by Congress for providing pension benefits in the form of a lump sum, *see* 29 U.S.C. § 1055(g), and which Congress has never extended to the calculation of QJSA or QOSA benefits under 29 U.S.C. § 1055(d). ERISA does not mandate specific interest rates or mortality tables to calculate QJSAs or QOSAs. Indeed, ERISA does not even define what "actuarial equivalence" in 29 U.S.C. § 1055(d) means. ERISA's silence has prompted several courts to dismiss claims identical to those asserted by Plaintiffs based on their finding that 29 U.S.C. § 1055(d) does not require use of reasonable actuarial assumptions *at all*. *See Drummond v. S. Co. Servs., Inc.*, 2024 WL 4005945, at *5 (N.D. Ga. July 30, 2024); *Watt et al. v. FedEx et al.*, No. 23-cv-02593 (W.D. Tenn. Sep. 19, 2023), Dkt. 66. Even assuming that ERISA requires use of reasonable actuarial assumptions, it has been well established law for over 30 years that reasonableness must be measured by reference to a range of permissible assumptions, *see, e.g.*, *Combs v. Classic Coal Corp.*, 931 F.2d 96 (D.C. Cir. 1991); *Cruz v. Raytheon Co.*, 435 F. Supp. 3d 350, 352 (D. Mass. 2020), not Mr. Altman's idiosyncratic application of inapplicable IRC 417(e) assumptions.

Moreover, Plaintiffs' Motion incorrectly describes Mr. Altman's analysis. Although

6

1  Plaintiffs' Motion claims that Mr. Altman identified 800+ members of the "proposed
2  Class" by "compar[ing] the Plan JSAs to JSA benefits generated by the 'Applicable
3  Mortality Table' [in IRC 417(e)] … and the 'Applicable Interest Rate' [in IRC 417(e)],"
4  Dkt. 62 at 3, that description is imprecise and inaccurate.

5        The "Applicable Mortality Table" defined in IRC 417(e) has a specific meaning. It
6  refers to the table specified by IRC 417(e)(3) that is equally weighted 50% male and 50%
7  female. *See, e.g.*, IRS Notice 2023-73, 2023-45 IRB 123. Mr. Altman did not apply that
8  table. Instead, he manipulated the "Applicable Mortality Table" to reflect the gender
9  balance of the Plan's population: 75% male / 25% female. Dkt. 63.2 at 17.

10        Further, Mr. Altman's selected interest rate is not simply the "Applicable Interest
11  Rate." Dkt. 62 at 3. IRC 417(e) permits the use of at least fifteen different interest rates that
12  change at least every year. When selecting an interest rate under IRC 417(e), one must
13  select (1) a "stability period," which can be annual, quarterly, or monthly and (2) a
14  lookback month, which can range from the first to the fifth month before the stability
15  period. 26 C.F.R. § 1.417(e)-1(d)(4). Mr. Altman defines actuarial equivalence by
16  arbitrarily selecting an annual stability period and an October lookback month of the year
17  preceding the participant's benefit commencement date. Ex. D at 83:4-12. Mr. Altman's
18  selection criteria is unsupported and circular—he considers these specific IRC 417(e)
19  assumptions reasonable merely because they are the assumptions he chose to apply. *Id.* at
20  84:9-13 ("Q: But the only reason [another set of IRC 417(e) assumptions is] not reasonable
21  is because you happened to pick a different combination of lookback month and stability
22  period? A: Right."); *see also id.* at 84:13-85:4.

23        Using his preferred IRC 417(e) assumptions, Mr. Altman identifies "roughly" 811
24  individual participants who he alleges the Plan has harmed. *Id.* at 222:3-12. Notably, Mr.
25  Altman's cohort does not include every Plan participant receiving a JSA benefit. *See id.* at
26  220:12-24 (confirming certain participants were not harmed using Altman's model); *also*
27  Ex. K, Terry Rebuttal Report ¶¶ 19-20 (showing Participant P1 would not suffer damages
28  using Altman's model). So, using Mr. Altman's IRC 417(e) assumptions would *not* result

7

in increased benefits for all the Plan's JSA recipients. *See id.*

## V.  The Evolution of Plaintiffs' Proposed Class.

Just as Plaintiffs' legal theory has evolved, so has their class definition. Plaintiffs filed their Complaint (Dkt. 1) on October 13, 2022, and filed the FAC (Dkt. 17) on December 9, 2022. Both Complaints defined the proposed class, in relevant part, as: "All participants in and beneficiaries of the Plan who began receiving a JSA or QPSA after November 1, 2016." Dkt. 1 ¶ 70; Dkt. 17 ¶ 70.

On January 17, 2025, Plaintiffs filed their Motion for Class Certification (Dkt. 62). Plaintiffs now seek to certify a considerably different class:

> All participants and beneficiaries of the Plan who began receiving a JSA after November 1, 2016 *whose monthly JSA benefit would be greater if calculated using the Applicable Mortality Table as defined in Internal Revenue Code § 417(e)(3)(B) in the year of the participant's Benefit Commencement Date and the Applicable Interest Rate as defined in Internal Revenue Code § 417(e)(3)(C) from the October of the year preceding the participant's Benefit Commencement Date.*

Dkt. 62 at 4 (emphasis added). Plaintiffs new proposed class significantly narrows the definition to apply to only those "whose benefits would be greater if calculated" using *one of the many combinations of actuarial assumptions* in IRC 417(e). *Id.* The new definition is further limited by the arbitrary exclusion of participants receiving an "Over/Under" benefit, a benefit form which decreases payment amounts after age 62 to keep participants' benefits level once social security begins. *Id.* Plaintiffs' class definition makes no mention of participants receiving other benefit forms, such as early retirement benefits or partial lump sum benefits, or a combination of these benefit types. *See id.*

## VI.  The Mismatch Between the Proposed Class and Those Allegedly Harmed.

Mr. Altman's definition of actuarial equivalence employs different actuarial assumptions than those Plaintiffs advocate for in their proposed class definition. Plaintiffs' proposed class thus does not match their own expert's analysis of those allegedly harmed.

Plaintiffs' class definition relies on the use of the Applicable Mortality Table—a mortality table with a 50% male / 50% female gender blend—while Mr. Altman identifies

8

his allegedly harmed group by using the Applicable Mortality Table with a 75% male / 25% female gender blend. *See supra* § IV. Plaintiffs class definition is also unclear about whether to apply the IRC 417(e) assumptions to the SLA at benefit commencement date or normal retirement age, and which age-rounding methodology to use.

## ARGUMENT

A class action is an "exception to the usual rule that litigation is conducted by and on behalf of the named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Plaintiffs must show that the proposed class satisfies all the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Plaintiffs must further satisfy the requirements of at least one subsection of Rule 23(b). *Id.* Class certification is "not to be granted lightly." *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024). Satisfaction of each Rule 23 requirement inevitably "entail[s] some overlap with the merits of the plaintiff's underlying claim[s]" because "class determination generally involves considerations that are enmeshed in the factual and legal issues" raised by the action. *Dukes*, 564 U.S. at 351.

### I.     Plaintiffs' Proposed Class Fails to Meet the Requirements of Rule 23(a).

#### A.     Plaintiffs' Proposed Class Is Not Ascertainable.

Rule 23(a) requires class membership to be adequately defined and clearly ascertained by reference to objective criteria. *See Ambrosio v. Progressive Preferred Ins. Co.*, 2024 WL 915184, at *3 (D. Ariz. Mar. 4, 2024). Plaintiffs' proposed class fails this requirement on its face.

Most notably, the proposed class definition does not specify whether the IRC 417(e) assumptions it incorporates should be applied to each participant's SLA at benefit commencement date or normal retirement age. This is a disputed legal issue in the case.

Each named Plaintiff retired early and received an early retirement subsidy. Ex. H at 14:13-16; Ex. I at 17:9-11; Ex. J at 10:21-22. Plaintiffs appear to believe that, for purposes of determining whether their JSAs are actuarially equivalent to their SLAs, the IRC 417(e) assumptions should be applied to the subsidized benefits they began receiving

9

when they retired early. Defendants, by contrast, argue that 29 U.S.C. § 1055 protects only the unsubsidized benefits they would have received at normal retirement age. Dkt. 19 at 8. This matters because, as the parties' experts agree, no Plaintiff has been injured if Defendants are correct on this legal point. *See* Ex. E ¶¶ 245-47 & Fig. 12 (Plaintiffs' JSAs exceed the actuarial present value of their SLAs using IRC 417(e) assumptions at normal retirement age); *also* Ex. D at 238:11–240:7 (agreeing with Figure 12).[2]

At present, what is important is that, if Plaintiffs are right about this disputed legal issue, they would be members of the proposed class. However, if they are wrong, they would not be. "Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825; *see also Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010) ("obvious problems [] exist when the class itself is defined in a way that precludes membership unless the liability of the defendant is established").

### B. Plaintiffs Fail Rule 23(a)'s Commonality Requirement.

Because Plaintiffs' class definition likely includes many JSA recipients who were not harmed (as well as arbitrarily excludes some Plan participants who may have been), the class definition does not meet Rule 23(a)'s commonality requirement.

Rule 23(a) requires that the proposed class present "a common contention" capable of classwide resolution "in one stroke." *Dukes*, 564 U.S. at 350. "What matters to class certification … is not the raising of common 'questions' … but rather, the capacity of a class-wide proceeding to generate common *answers* … ." *Id.* When "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Messner*, 669 F.3d at 824.

---

[2] The class definition is also flawed in other ways. For example, to generate a conversion factor, one must adopt an age-rounding method. But the class definition does not specify one. Different age rounding methods impact arbitrarily who is in the proposed class. Ex. K ¶ 122 & Fig. 9 (showing how age-rounding method affects class membership).

10

The "common harm" alleged in the FAC is that Plan participants who elected JSAs are not receiving benefits that are actuarially equivalent to their SLAs because the Plan's actuarial assumptions are unreasonable. Dkt. 62 at 5-6. Even assuming *arguendo* that is true, courts "typically regard the reasonableness of actuarial assumptions as 'a zone, not a point.'" *Cruz*, 435 F. Supp. at 352 (quoting *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 706 (4th Cir. 2018)). In other words, because ERISA "does not require that plans use any specific mortality table or any specific interest rate at any given time," plan sponsors (at a minimum) are free to "choose from [among any] options that fall within the range of reasonableness." *Smith v. Rockwell Automation*, 438 F. Supp. 3d 912, 921 (E.D. WI 2020).[3]

In prior actuarial equivalence cases, the plaintiffs' requests for class certification foundered upon this rock. The courts denied class certification because they recognized that plans may choose among many different actuarial assumptions, and that those choices do not uniformly affect plan participants. Because not all class members would be injured under any set of reasonable assumptions, and because different class members would prefer different sets of reasonable assumptions, those courts concluded that commonality was absent. *See Thorne v. U.S. Bancorp*, 2021 WL 1977126, at *2 (D. Minn. May 18, 2021) (commonality lacking because some potential class members were "currently receiv[ing] actuarially equivalent benefits"); *Torres v. American Airlines*, 2020 WL 3485580, at *12 (N.D. Tex. May 22, 2020) ("Because the relief Plaintiffs seek, if consistently applied, would harm some class members they seek to represent, a fundamental conflict prevents the representative Plaintiffs from representing the class.").

Here, in an attempt to avoid that difficulty, Plaintiffs propose a manufactured class definition based on their desired outcome in this case. Their class definition assumes not only that the Plan's JSA conversion factors are unreasonable but also that the *only*

---

[3] Other courts have found that actuarial equivalence is not determined by a measure of reasonableness but only by the assumptions stated in the plan document. *See supra* § IV.

11

reasonable conversion factor is the one generated by the assumptions in the class definition.[4] But if Plaintiffs are wrong about that, then their proposed class is likely to include individuals who were not harmed—and to arbitrarily exclude individuals who were harmed. In other words, Plaintiffs' class definition only identifies the relevant universe of individuals harmed by the Plan's alleged use of unreasonable actuarial factors if Plaintiffs run the table on virtually every disputed merits issue in the case. Class certification is not appropriate under these circumstances. *Winters v. Loan Depot LLC*, 2022 WL 22865378, at *7 (D. Ariz. Mar. 17, 2022) (striking class definition that "require[d] a legal conclusion to determine class membership").

*First*, the Court would need to determine that the use of IRC 417(e) assumptions is the *only* way to define actuarial equivalence. As noted, Mr. Altman himself admits that neither ERISA nor actuarial practice compels this conclusion, and his own methodology modifies the IRC 417(e) mortality table. *See supra* § IV. Indeed, because reasonableness is a range, there is every reason to doubt it. Yet Plaintiffs' class definition only defines a group of people who all suffered a common injury if this dubious conclusion is true.

For example, in the FAC, Plaintiffs identify the mortality assumptions that Pinnacle West uses for financial reporting purposes as reasonable. Dkt. 17 ¶ 55. If actuarial equivalence were measured using these assumptions, rather than Mr. Altman's IRC 417(e) assumptions, over 22% of the proposed class would not have suffered any injury. Ex. K at A-7; Ex. L, Terry Rebuttal Report App. D (Mr. Altman's factors compared to Scenario D factors). In fact, if even minor tweaks to Plaintiffs' preferred assumptions are made, many participants, including Mr. Skrtich, would not suffer any harm. *See* Ex. K ¶ 124 & Fig. 10 (minor tweaks to Mr. Altman's assumptions lower Mr. Skrtich's JSA factor by up to 5%).

---

[4] Notably, Plaintiffs' own expert advocates for slightly different assumptions here and has advanced significantly different assumptions in other, similar cases. *See* Ex. N, Altman Expert Report, *McAlister v. MetLife Ins. Co*, No. 18-cv-11229, Dkt. 156-1, at 16-17 (using RP-2000, RP-2006, and Pri-2012 mortality tables and interest rates with a November lookback period to calculate "reasonable" conversion factors). This alone undercuts the assertion that the assumptions in the class definition are the only reasonable ones.

*Second*, even if the Court somehow concluded that ERISA requires the use of an IRC 417(e) interest rate, it is undisputed that there are *at least 15 ways* to apply them. *Id.* at 7 & n.1; Ex. D at 81:23-82:13 (noting that Mr. Altman picked one of multiple "allowable ways to calculate 417(e)" given the "variations" in the assumptions). Any of these different applications of the IRC 417(e) assumptions would affect the universe of JSA recipients who were harmed. For example, nothing compels the use of the specific lookback month and stability period built into the class definition. The Court may agree with Plaintiffs on those issues, but it may also determine that one of the at least 14 other variations on the IRC 417(e) rates is likewise appropriate for Plan use—especially given that neither Plaintiffs nor their expert provide any legal support for their selections.

Changing the lookback month and stability period changes the group of participants who were (and were not) injured. *See, e.g.*, Ex. K ¶¶ 118–119 & Fig. 7 (showing participant P5 would fall out of the allegedly harmed group with the use of an alternative lookback month). Likewise, some JSA recipients would prefer other combinations of lookback months and stability periods. *See id.* ¶¶ 118–119 & Fig. 8 (showing examples of participants who would prefer an alternate lookback month). These intraclass conflicts further demonstrate the absence of commonality. *See, e.g.*, *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1032 n.8 (9th Cir. 2024) (expert's harm calculation would "fail to produce common answers" if that model did not "apply in a manner common to the class").

*Third*, Plaintiffs' class definition presupposes that the Court will require use of the "Applicable Mortality Table," which is the IRC 417(e) mortality table weighted 50% male and 50% female. Again here, unless the Court determines that the class definition's 50%/50% gender blend is appropriate, the proposed class definition would impermissibly include individuals who were not injured (and potentially exclude participants who were). *See* Ex. K ¶¶ 125-28 (showing example participant whose JSA factor would decrease, removing them from the proposed class, based solely on a change to the gender blend).

And there is every reason to doubt that a 50%/50% gender blend is appropriate, let alone required. As noted, Plaintiffs' own expert advocates a 75% male / 25% female

weighting, in order to reflect the gender blend of the Plan's participants. *See* Ex. D at 149:19-23. Even minor changes to the gender blend can impact the group of JSA recipients who were allegedly harmed. For example, Defendants' expert advocated for using a gender blend based on the percentage of Plan participants who selected JSAs (86% male / 14% female). Using that gender blend would mean that some members of the proposed class did not suffer any injury. *See* Ex. K ¶¶ 125-28 (showing example participant who would have no harm using the Applicable Mortality Table blended 86% male /14% female).

*Finally*, these same flaws that prevent commonality also demonstrate that Plaintiffs' proposed class is an impermissible fail-safe class that cannot be certified. "A fail-safe class is commonly defined as limiting membership to plaintiffs described by their theory of liability in the class definition such that the definition presupposes success on the merits." *Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017); *see also Kamar*, 375 F. App'x at 736. As discussed above, Plaintiffs run afoul of this prohibition because their class is defined only by those who "win" if the Court adopts their view of liability and damages at every turn. Class certification is improper in such circumstances. *See Hurt v. Shelby Cnty. Bd. of Educ.*, 2014 WL 4269113, at *18 (N.D. Ala. Aug. 21, 2014) (denying certification where "the class is defined in terms of the ultimate question of liability").

### C. Typicality Is Not Met Because Plaintiffs' Distinct Benefit Forms Subject Them to Unique Defenses.

Rule 23(a)'s typicality requirement is not met where the named Plaintiffs' circumstances "render them vulnerable to unique defenses which threaten to become the focus of the litigation." *Moorer v. StemGenex Med. Grp., Inc.*, 830 F. App'x 218, 219 (9th Cir. 2020). That is true here. Each named Plaintiff receives benefits which differ from a large portion of the proposed class such that no Plaintiff's claims are "typical." Specifically, Plaintiffs' claims are subject to two unique defenses that defeat typicality.

*First*, none of the named Plaintiffs receive a QJSA or QOSA, which makes them all subject to the unique defense that their benefits are not protected by the provision of ERISA under which they sue. This dooms their bid for class certification. *Cf. Berube v. Rockwell*

*Automation, Inc.*, 2023 WL 8468522, at *6 (E.D. Wis. Apr. 3, 2023) (finding no typicality in actuarial assumptions case where putative class members faced a unique issue not shared by named Plaintiff that depended upon interpretation of 29 U.S.C. §1055(d)).

29 U.S.C. § 1055(d) protects only a plan's QJSA and QOSA. The Plan's QJSA is a 50% JSA and so 29 U.S.C. § 1055 sets the Plan's QOSA as a 75% JSA. Dkt. 63.1 at 48; 29 U.S.C. § 1055(d)(2)(B). Mr. Peck cannot adequately represent the proposed class because he is receiving a 100% JSA. Ex. A at 1. Mr. Skrtich also receives a 100% JSA, which is not the QJSA or QOSA. Ex. C. His benefit is also not typical because he received a combination JSA and lump sum benefit. *Id.* When he made this election, he was informed that he was opting out of the Plan's QJSA and QOSA, and his spouse signed and notarized a form consenting to do so. Ex. F. Mr. Riccitelli receives his benefit as a combination 50% JSA and lump sum, which is not a QJSA or QOSA, and like Mr. Skrtich, he and his spouse were informed they were opting out of this protected benefit. Ex. B at 1; Ex. G.

Whether Plaintiffs' benefits are protected under 29 U.S.C. §1055(d) is a dispositive question. If Plaintiffs cannot prove that their benefits are protected, their case would be dismissed to the detriment of hundreds of class members who do not face this unique issue. 358 participants receive 50% or 75% JSAs and would not be subject to the defense that a 100% JSA is not a protected benefit. *See* Ex. K at App. C. And only 133 participants receive JSAs with partial lump sums, which poses a separate, unique hurdle. *See id.*

*Second*, Plaintiffs are subject to a unique defense because they all elected to receive early retirement benefits ahead of the Plan's normal retirement age. While the Plan's normal retirement age is 65, Dkt. 63.1 at 48, each Plaintiff elected to receive their JSA benefits before that age, while other potential class members began receiving their benefits at age 65 or later. Ex. M, Altman Excerpted Workpapers (showing 363 of 811 participants with benefit commencement dates of 65 or older)[5]; Ex. J at 10:21-22 (Plaintiff Skrtich

---

[5] Mr. Altman's workpapers show 873 participant records. These records reflect 811 unique participants, as certain participants are reflected twice. *See* Ex. K at 26 & n.50.

15

1 elected benefits at age 61); Ex. H at 14:13-16 (Plaintiff Peck retired before age 65); Ex. I at 17:9-11 (Plaintiff Riccitelli elected benefits at age 58). The early retirement benefits that Plaintiffs receive are more valuable than JSAs of their accrued benefits—even when calculated using their 417(e) assumptions. *See supra* § I.A. Defendants contend that ERISA requires only that participants' JSA benefits be actuarially equivalent to the value of their SLAs at normal retirement age. Dkt. 19 at 8 & n.2. Defendants thus will contend that Plaintiffs have suffered no harm. *See Thorne*, 2021 WL 1977126, at *2. This independent unique defense precludes certification. *See In re White*, 64 F.4th 302, 2023 WL 2763812 (D.C. Cir. Apr. 4, 2023) (noting that typicality would be lacking if "named plaintiffs might not be members of the class come final judgment").

## II. Plaintiffs' Proposed Class Fails to Meet the Requirements of Rule 23(b).

### A. Plaintiffs' Claims Fail Under Rule 23(b)(1).

Certification under Rule 23(b)(1) is inappropriate where a plaintiff cannot demonstrate that class members are similarly situated such that inconsistent adjudications are a concern. *See Torres*, 2020 WL 3485580, at *14 (denying class certification of actuarial assumptions class where absent class members' benefits would not actually increase with the plaintiffs' requested relief); *see also Thorne*, 2021 WL 1977126, at *2 (rejecting certification under 23(b)(1) for proposed actuarial assumptions class). That is the case here, where certain Plan participants would fare worse with benefit calculations performed using Plaintiffs' preferred assumptions than they do now. *See, e.g.*, Ex. K ¶¶ 19-20. Similarly, Plaintiffs' arbitrary exclusion of participants receiving an "Over/Under" benefit presents a risk of inconsistent adjudications, as Plaintiffs' own expert admits that some of those participants are harmed under their theory. Dkt. 62 at 4; Ex. D at 218:25–220:24. Those participants might therefore bring additional, potentially conflicting claims.

### B. Plaintiffs' Claims Fail Under Rule 23(b)(2).

Certification under Rule 23(b)(2) is also inappropriate because the alleged conduct cannot "be enjoined or declared unlawful [] as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360. Plaintiffs' proposed class fails that test because some

putative class members were not injured by the Plan under Plaintiffs' theory. *See* Ex. D at 218:25–220:24 (acknowledging that certain participants identified have no damages under his analysis). The Plan's actuarial assumptions cannot therefore be said to be "declared unlawful" as to all proposed class members, nor is "final injunctive relief . . . appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(1-2). Moreover, a class may not be certified under Rule 23(b)(2) unless the monetary relief sought is "merely incidental to the primary claim for injunctive relief." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001). Here, the monetary relief Plaintiffs seek is integral. *See Hamrick v. E.I.D.P., Inc.*, 2024 WL 359240, at *7 (D. Del. Jan. 31, 2024), *report and recommendation adopted*, 2024 WL 2817966 (D. Del. June 3, 2024) (finding plaintiff in actuarial equivalence case sought "quintessentially legal relief—i.e., the payment of money.").

### C. Plaintiffs' Claims Fail Under Rule 23(b)(3).

Rule 23(b)(3) requires not only that putative class members share common questions of law or fact, but also that those questions "predominate over any questions affecting only individual members." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022). The predominance criterion is "even more demanding than Rule 23(a)." *Behrend*, 569 U.S. at 34. Plaintiffs fail this requirement for the same reasons they cannot establish commonality under Rule 23(a). *See supra* § I.C. Each participant's individual circumstances (i.e., age, benefit commencement date, benefit type, etc.), as well as the particular yardstick the Court will use to measure actuarial equivalence on the merits, determines not only whether they have experienced any harm, but also which of many different remedies they would prefer. *See supra* § I.B. Plaintiffs' contrived class definition only serves to highlight the lack of predominance. *See Behrend*, 569 U.S. at 34 ("[R]espondents' model falls far short of establishing that damages are capable of measurement on a classwide basis.").

### CONCLUSION

For the foregoing reasons, Plaintiffs have failed to meet their burden under Rule 23 and the Court should therefore deny Plaintiffs' Motion for Class Certification.

Dated: February 28, 2025

SNELL & WILMER L.L.P.
By: *s/ Joseph G. Adams*
Joseph G. Adams
Zachary G. Schroeder
One East Washington Street
Suite 2700
Phoenix, Arizona 85004


COVINGTON & BURLING LLP

Christian J. Pistilli
Robert Newman
Nicholas Pastan
850 Tenth Street, NW
Washington, DC 20001-4956

*Attorneys for Defendants Pinnacle West Capital Corporation, The Benefit Administration Committee of the Pinnacle West Capital Corporation Retirement Plan, and John/Jane Does 1-5*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record.

By: *s/ Joseph G. Adams*
Joseph G. Adams
SNELL & WILMER L.L.P.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004